UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 21-cv-1134 (PJS/ECW)

Steven L. Smith,

        Plaintiff,

   v.

United States Postal Service and
Louis DeJoy, U.S. Postmaster
General, in his official capacity,

        Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

Plaintiff Steve Smith's allegations paint a picture of toxic relationships with his coworkers at Defendant U.S. Postal Service. The record reveals dozens of encounters ending in employees screaming at each other, insulting comments delivered under employees' breath, multiple phone calls to the police, and hundreds of reports to managers tasked with sorting through the finger-pointing. For the employees involved in these long-running personality disputes—"warring parties," as one witness put it—the workplace was undoubtedly unpleasant.

But the voluminous record lacks one thing critical to Smith's claims: evidence that these disputes or his termination were because of Smith's race or because he filed this lawsuit. As a labor relations employee described, "the way employees use the term

'harassment' is radically different from how the law handles it." Title VII is not a general civility code for the workplace, and generalized personality conflicts between employees, no matter how toxic, are not illegal. Because Smith cannot establish he suffered a hostile work environment or was discriminated against *because of his race*, and because there is no causal connection between this lawsuit and his termination, his claims for hostile work environment, discrimination, and retaliation fail. Defendants respectfully request the Court grant their motion for summary judgment.

## BACKGROUND

### I.    The USPS

USPS provides mail processing and delivery services in the United States. USPS employs more than 600,000 people. USPS operates the Oak Park Heights Carrier Annex in Stillwater, Minnesota, and the St. Paul Processing and Distribution Center (P&DC) in Eagan, Minnesota. As an employer, USPS is incredibly diverse: more than half its workforce is people of color.[1] One employee described it as the "most diverse place I've ever worked in my life." (Allison: 183:16-184:6.)[2]

In service to this diverse workforce, USPS maintains a zero-tolerance harassment policy. (Fisher I: 116:5-7.) To help managers address harassment, USPS publishes a guide on understanding, investigating, and preventing harassment called "Publication 552."

---

[1]    *See* U.S. Postal Service, *Diversity, Equity & Inclusion*, *available at* https://about.usps.com/careers/working-usps/diversity-inclusion.htm (last visited July 7, 2023).

[2]    All cited deposition transcripts are attached to the Declaration of Andrew Tweeten.

(Ex. 1.)[3] It instructs management to "[t]ake prompt disciplinary action where appropriate," (*id.* at 25), and ensure discipline is "consistent with the severity of the conduct and [] executed consistently," (*id.* at 5).

USPS's workforce is unionized. Non-management employees at facilities relevant to this suit are members of the American Postal Workers' Union. The collective bargaining agreement (CBA) and the parties' past practices outline a system of progressive discipline that typically provides for discipline in the order of (1) letter of warning; (2) seven-day suspension; (3) 14-day suspension; then (4) notice of removal (i.e., termination). (Jones-Thomas III: 9:15-20; Ex. 2 at 96-101.) The CBA states disciplinary records generally remain part of an employee's file for two years. (Ex. 2 at 100-01.) When a safety risk arises, USPS can immediately place an employee in an off-duty status without pay called "emergency placement," (Jones-Thomas III: 98:24-99:8; Ex. 2 at 99.)

The CBA also establishes a multi-step grievance and arbitration procedure whereby the union or employee can challenge discipline imposed. (Ex. 2 at 78-95.) If the parties do not agree on resolution of the grievance, the matter eventually goes to binding arbitration, and an arbitrator can overturn or adjust the discipline. (*See id.*) As one labor relations employee testified, once a grievance is filed, it is management's responsibility "to prove the case." (Jones-Thomas III: 42:12-24.) Management is particularly cognizant of this responsibility when it investigates uncorroborated interpersonal disputes between employees. (*Id.*: 41:20-42:24.) USPS typically does not issue discipline in such scenarios

---

[3] All cited exhibits are attached to the Declaration of Rachael Love-Hobbs.

because "[i]t's very hard to prove" if both employees are interviewed and "they both deny it." (Jones-Thomas II: 170:22-171:10.) When USPS has tried to issue discipline in these situations in the past, "the union filed a grievance and we had to rescind the discipline." (*Id.*: 171:18-25.)

## II.   Smith's Employment in Stillwater

Steve Smith, who is Black, began working for USPS as a custodian in Stillwater on October 19, 2013. (Ex. 3.) Smith's wife, Michelle Smith ("Michelle"), who is also Black, also worked in Stillwater. Michelle brought her own hostile work environment lawsuit against USPS based on many of the same allegations present here; in March of this year Judge Menendez granted USPS summary judgment. *See Smith v. DeJoy*, No. 20-cv-00498, 2023 WL 2571829 (D. Minn. March 20, 2023).

Smith alleges,[4] after he approached soon-to-retire Postmaster Terry Hjelmgren about a potential promotion on March 15, 2016, Hjelmgren told Smith he would not receive the promotion because he was Black and the "good old boys" run USPS. (Exs. 4, 5.) Two months later Smith submitted a request for EEO pre-complaint counseling regarding the conversation with Hjelmgren. (Exs. 4, 5.) When he later filed an EEO complaint in September 2016,[5] Smith alleged supervisor Charlotte Wilson posted a picture of a gorilla in her workstation, and Hjelmgren, in two visits to the facility after retiring, called Smith

---

[4] As required on summary judgment, allegations are presented the light most favorable to Smith. In doing so, Defendants do not endorse Smith's claims and expressly reserve the right to contest them in later proceedings, if necessary.

[5] Smith pursued his claim through the administrative process. On May 4, 2017 USPS found the evidence did not support Smith's claims. The EEOC affirmed on November 30, 2018. (Exs. 6, 7.)

"monkey man" and told him to "go back to the zoo." (Exs. 5, 8, 9.) Michelle later testified she heard Wilson say the gorilla picture looked like Steve. (M. Smith: 208:5-25.)

In December 2016, Smith amended his earlier request for EEO pre-complaint counseling based on the actions of a coworker, Tommy Klein.[6] (Exs. 10, 11.) Smith alleged Klein accused him of not doing his job. (*Id.*) Smith's request did not say Klein had made any mention of race, instead, it accused Klein of creating a "HOSTILE Environment" with his "malicious, and (small-minded) slander." (*Id.*) Although not included in that complaint, Smith later testified Klein told him he was going to "make sure that he got rid of [the Smiths] just like the Obamas." (Smith I: 18:16-25.)

That same month, Smith transferred to the P&DC. (Smith I: 26:20-23.) Michelle transferred there soon after. (M. Smith: 37:11-13.)

## III. Smith Moves to the P&DC; Conflict with Ann Ziemer Begins

Smith began work at the P&DC on December 10, 2016. (Ex. 12.) Almost immediately the Smiths started having run-ins with an employee named Ann Ziemer, a white woman with a history of personality conflicts with other employees. One coworker described Ziemer as a "weirdo" who "makes all sorts of noises," (Allison: 57:10-18), another said she was "passive aggressive" and does things like steal people's lunch bags and "throw [them] in the trash," (Knotz: 34:22-35:7), and another reported she "bullies new employees," (Ex. 13.) The record contains numerous allegations—including allegations from several white employees—regarding harassment perpetrated by Ziemer.

---

[6] The agency handled this issue in conjunction with Smith's September 2016 EEO complaint. (Ex. 6 at 2.)

(Fisher II: 37:15-20; Ziemer: 29:16-15 (white employee accused Ziemer of stealing things and following people around); Smith I: 41:22-45:25 (alleging Ziemer stalked or followed other employees, some of whom are white); M. Smith: 71:15-72:3 (alleging Ziemer harassed a white custodian).)

Smith alleges on the first day he started working at the P&DC Ziemer showed him a picture of a cat and asked if he wanted to "pet her pussy." (Smith I: 30:25-31.) Smith "told her to get away." (*Id.*) Afterwards, Ziemer started following him and Michelle around and gossiping about them. (Ex. 14.) For example, Smith reported to management on February 22, 2017, that he saw Ziemer yell at Michelle after Michelle asked her to stop bothering them. (*Id.*) Ziemer reported to management the following day that Michelle yelled at her, "I am TELLING you to stop talking about us!! YOU ARE CREATING A HOSTILE WORK ENVIRONMENT!! I am going to file a grievance against you!!!" (Ex. 15.)

On March 25, 2017, USPS management asked all three employees to simply stay away from each other. (Ex. 16.) They all agreed to do so, (*see id.*), but conflicts continued. Soon after, the Smiths allege Ziemer waited for them in the parking lot and followed them part of the way home. (M. Smith: 105:12-14; Smith I: 69:2-77:25.) On April 5, Ziemer reported Smith keyed her car, (*id.*: 85:13-86:2), on April 7, Smith reported he had seen Ziemer sitting outside their house in her car, (*id.*: 78:1-82:1), on April 26, the Smiths reported Ziemer tried to get them to walk in front of her car, (*id.*: 86:3-88:2), and on April 30, Michelle reported Ziemer looked at her through a window and took her broom (Ex. 17). Smith alleges starting in Spring 2017 Ziemer would follow him around and make

"weird noises," like animal noises, or sing a circus song. (Smith I: 58:4-21.) He also said Ziemer would refer to him and Michelle (rather than Black people generally) as "them people" or "those people." (*Id.*: 130:22-131:14.)

On May 31, 2017, in response to a complaint the Smiths made of a "hostile work environment," USPS management asked Operations Support Specialist Diana Kiser to formally investigate the Smiths' allegations. (Ex. 13.) Witnesses told Kiser bullying between the Smiths and Ziemer "goes both ways," Ann "bullies new employees," Ziemer and Smith do not like each other because they "both want to be top dog," and Ziemer has watched other employees as they work. (*Id.*) The Smiths made no allegations of race-based conduct to Kiser. (*Id.*) On June 23, 2017, Kiser concluded the "allegations of a hostile work environment and harassment are unsubstantiated" and there were "no real witnesses to any of the allegations." (*Id.*) A few days later, management issued Ziemer a Letter of Warning for failing to follow instructions to stay away from the Smiths. (Ex. 18.)

USPS tried to alleviate the ongoing conflicts in the summer of 2017 by moving Smith and Ziemer to separate facilities while allowing Michelle to remain at the P&DC, but the union filed a grievance and Smith and Ziemer were returned to the P&DC. (Franseen: 90:18-91:24.) Upon their return, USPS management again instructed all three to stay away from each other. (Exs. 19-20.) But in the months following, both Smith and Ziemer were disciplined for failing to follow these instructions. (Exs. 21- 23.)[7] Smith now reports that once he and Ziemer returned to the P&DC, Ziemer referred to him and Michelle

---

[7] The duration of Smith's letter of warning was reduced to six months through a grievance settlement. (Ex. 24.)

as "jigaboo" and "shit skin" at least three times. (Smith I: 93:6-13; 95:2-17.) In November 2017, the Postal Inspection Service investigated an allegation that Smith said to Ziemer: "Slap the shit out of you, you should die twice." (Ex. 25.) No witnesses were present. (*Id.*)

In December 2017, Smith reported that Ziemer came up behind him and put her breast on his shoulder. (Ex. 26.) Several weeks later he reported Ziemer for "marriage discrimination" and "sexual harassment" after she listened to a conversation between Smith, Michelle, and a supervisor. (Ex. 27.) A few months later, Smith filed an EEO complaint against Ziemer alleging retaliation, hostile work environment, and sexual harassment. (Ex. 28.)[8]

## A.   Conflicts with Ziemer Continue; Smith is Promoted; Conflicts with Justin Allison Begin

Smith's conflicts with Ziemer continued in the spring of 2018. Maintenance mechanic Justin Allison reported to management that Smith approached Ziemer from behind while she was resting on break and started playing "vulgar" music loudly on his phone. (Ex. 29.) Smith told management he asked Ziemer to move because she was blocking his way, then learned later she complained about his "vulgar" music. (Ex. 30.) Smith now alleges Ziemer told him she does not like rap music, she cannot stand Snoop Dogg, and she hates it when Smith is "acting black." (Smith I: 100:10-15.)

That summer, USPS promoted Smith from custodian to maintenance mechanic. (Ex. 31.) These promotions within USPS are determined through a combination of test

---

[8] Defendants do not challenge Smith's exhaustion of administrative remedies. Each time Smith filed an administrative EEO complaint, he pursued it to completion and where a decision was rendered by USPS or the EEOC, it was adverse to his position.

scores, an interview with supervisors, and, once an employee is determined eligible, seniority on the "promotion list." (Ingvalsen I: 206:3-207:19.) Smith obtained the required test scores but did not pass the interview in 2017. On May 17, 2018, P&DC maintenance supervisors Matt Nelson, Mitch Ingvalsen, and an HR representative interviewed him and gave him high enough scores that he was eligible for promotion. (Ingvalsen Decl. ¶¶ 4-8.) Smith was promoted to maintenance mechanic a few months later. (*Id.*)

After Allison reported Smith had blasted "vulgar" music at Ziemer, Smith and Allison began having repeated conflicts that escalated into reports to management.[9] It began with Allison reporting that Smith was "staring/glaring" at him, (Ex. 29), Smith retorted that Allison and Ziemer were making USPS a "hostile environment" and accused Allison of making up statements about him coming to work "smelling like alcohol" and harassing female employees, (Ex. 32), Allison reported Steve for calling him a "buster" and threatening to break his jaw, (Ex. 33), and for riding a facility bicycle[10] past him with an "intimidating stare," (Ex. 34). Smith's conflict with Ziemer also continued: on July 18, 2018, she called the police from the P&DC and reported Smith told her he was going to "fuck you up." (Ex. 35.) On July 19, 2018, Allison requested EEO pre-complaint counseling, seeking a transfer because Smith "threatened me bodily harm." (Ex. 36.)

---

[9] Allison considers himself biracial and states "I go by black/white, mixed." (Allison: 5:9-12.) Smith regards Allison as Black. (*See* Smith I: 145:2-23.)

[10] Certain employees at the P&DC use three-wheel pedal bikes to get around the large facility. (*See* Allison: 159:6-160:11.)

The incidents described above are just a smattering of the issues Smith, Allison, and Ziemer reported to management.[11]  Throughout 2018, management investigated and issued various levels of discipline to all three employees depending on the severity of the incident, the presence of witnesses or other corroborating evidence, and the employees' prior discipline. (*See, e.g.*, Exs. 37 (Allison seven-day suspension for reacting unprofessionally and calling police after he alleged Smith threatened him), 38 (Smith letter of warning for not following instructions to punch in/out away from Allison and Ziemer),[12] 40 (Smith seven-day suspension for threatening Allison), 41 (Ziemer letter of warning for yelling at Smith).) Management met with the employees in September 2018 to encourage them to get along to no avail. (Franseen: 32:11-36:7; 97:21-98:3.) One HR official testified to exasperation with the "continual back-and-forth on both sides." (*Id.*: 22:2-18.) She said, "there were always no witnesses. It was always he said, she said, he said, he said." (*Id.*: 29:5-15.)

### B.    Smith Finds a Note on his Toolbox

On December 17, 2019, Smith and Michelle found a note taped to Smith's toolbox that read "Caution: Dead Laker's[13] N[-word] Storage Ahead." (Ex. 42.) According to Ingvalsen, the supervisor on duty at the time, "alarms went off" as soon as the Smiths

---

[11]  Allison documented at least 45 run-ins with Smith between April 2018 and November 2021. These include at least two physical assaults (on one occasion Smith threw a garbage can at him over the wall of a bathroom stall), at least one occasion of being spat on, and at least one time Smith revealed his penis to him. (Allison: 51:22-52:18; 272:18-273:8.)

[12]  Through the grievance process this was reduced to an "official job discussion." (Ex. 39.)

[13]  Smith is a Lakers fan. (Smith I: 143:18-20.)

reported the note. The plant manager, labor relations, the Postal Inspection Service, and Office of Inspector General all investigated. (Ingvalsen II: 15:15-16:1; Ex. 43.) Management also isolated the area and photographed and confiscated the note. (Ingvalsen II: 15:15-16:1.) The Smiths believed Allison left the note, (*id.*; 17:23-18:1), but had no evidence. Management identified all employees on the clock at the time and interviewed them. (Ex. 44.)

Despite USPS's best efforts, investigators could not determine who had left the note; USPS did not find anybody who took responsibility for placing the note, nor were there any witnesses. (Invgalsen II: 19:5-11.) Smith alleges that around the time he found the toolbox note, Ingvalsen commented to him that, if Allison had left the note, "a Black person calling another Black person an N word ain't racism and that was their culture." (Smith II: 45:6-10.) Ingvalsen reports that upon explaining the dynamic between Allison and Smith, an OIG agent told him if Allison had left the note, the agent "did not consider this racially motivated as both parties are the same race and the use of this derogatory word is often socially acceptable between two individual[s] of the same race." (Ex. 45 at 4.)

After this incident, Smith's conflicts with Allison and Ziemer continued. (*See, e.g.*, Exs. 46 (investigating Allison's report that Smith called him a "dick" and Smith and Michelle were "circling him like sharks"); 47 (Allison's report that Smith was "giving [him and his fiancée] the eye").) On December 25, 2018, Smith reported that Ziemer, Allison, and another coworker, John Selbitschka, came up to him while he was using an ATM, and Selbitschka told him the machine "wasn't going to work for you because [you're] Black." (Ex. 48.) On April 17, 2019, Smith filed an EEO complaint about the toolbox note. (Ex. 49.)

These disputes continued for years. (*See, e.g.*, Exs. 50 (Allison reports Smith called him a "bitch-ass n****r"); 51 (Smith reports Allison for, among other things, riding his bike through the maintenance shop ringing his bell and yelling "get to work").) USPS continued to discipline the various employees to no avail. (*See, e.g.*, Ex. 52 (Allison letter of warning for altercation with Smith).) On August 4, 2020, Smith filed an EEO complaint about a seven-day suspension he was issued[14] after a heated fight with management. (Exs. 54-59.)

## C.   Disputes with Selbitschka

In October 2020, approximately six months into the COVID-19 pandemic, disputes between Smith and Selbitschka resulted in both receiving discipline. On October 4, 2020, Smith was standing outside the P&DC while on break with two coworkers. (Exs. 60-61.) When Selbitschka walked past, Smith asked him to put his mask on. At the time, masks were required inside the building but not outside. (Thomas-Smith: 11:6-12:4.) Selbitschka "went crazy," called Smith a "Black bitch," and when Smith responded, "God bless you," Selbitschka replied, "fuck you and your God." (Smith II: 107:6-11.) One witness reported Smith also began yelling and that they "were both antagonizing each other," (Thomas-Smith: 6:23-7:22), although another reports that Smith "just sat there" with his coworkers "and let [Selbitschka] have his temper tantrum." (Weldon: 7:9-12:14.)

A few days later, another witness reported that she saw Smith and Selbitschka "yelling quite loudly at each other" in the facility, "both were using every swear word in

---

[14] Through the grievance process, this was reduced to a Letter of Warning to remain in his employment file for six months, provided he received no further discipline. (Ex. 53.)

the book, and Mr. [Selbitschka], appeared . . . to be getting violent." (Ex. 62.) Smith apparently said to Selbitschka, "why don't you say what you did in the parking lot," and accused Selbitschka of "being racist." (*Id.*) The witness reported "[b]oth were out of control," and had she not stepped between them, "there would have been punches thrown." (*Id.*) Selbitschka and Smith were both given seven-day suspensions. (Exs. 63-64.)[15]

### D.     USPS Removes Smith for Threatening Coworkers

In April 2021, several of Smith's coworkers reported to management that Smith had been threatening and insulting them. A plant manager contacted the Postal Inspection Service on April 9, 2021, concerned that Smith may have a weapon in his car, after a mail handler reported Smith made a "finger gun," pointed it at him, and said "I'll see you outside." (Ex. 66.) The Postal Inspection Service agents informed the plant manager and others that the allegation that Smith had a weapon in his car seemed to be "pure speculation," but asked Smith to consent to a search of his car regardless; Smith declined. (*Id.*) On April 24, 2021, a letter automation clerk reported Smith "gave me the gun sign" while she was working, and Smith had told her before that the sign "was to shoot me." (Ex. 67.) The same clerk reported two days later Smith told her "I bet my dick is bigger than your husband's." (Ex. 68.)

Smith also had run-ins with several managers around the same time (Exs. 69-70); one manager characterized his feelings about having to deal with Smith as "[i]t is getting

---

[15] Through the grievance process the retention period for Smith's suspension was reduced to one year. (Ex. 65.)

old." (Ex. 71.)[16] On May 1, 2021, Allison's girlfriend reported Smith had been raising a "closed fist" towards her, called her a "fat bitch," and sarcastically congratulated her on being pregnant (when she was not), among other interactions. (Ex. 72.) Management also saw Smith driving a Powdered Industrial Truck through the building that same day, despite the fact it was neither part of his assignment nor approved by a supervisor. (Ex. 73.)

On May 4, 2021, the same letter automation clerk reported that Smith had once again made "finger gun" gestures toward her, (Exs. 74-75), and Smith was seen following Allison around despite prior instructions to avoid him. (Ex. 73.) A team of managers decided to put Smith on emergency placement, but Smith refused to leave the facility until police were called. (Exs. 76-77.)[17] Smith filed an EEO complaint on June 16, 2021, but the agency dismissed it because the allegations overlapped with this suit, which had already been filed. (Ex. 79.)

On May 24, 2021, after an investigation, supervisor Kurtis Morrissette recommended USPS remove Smith from employment. (Ex. 80.) Morrissette ultimately removed Smith a few days later for "unacceptable conduct" based on the threats to coworkers, the insults to Allison's girlfriend, the reports that he was following Allison, and the inappropriate use of a Powered Industrial Truck. (Ex. 73.) The removal was later settled

---

[16] Smith filed this lawsuit on April 30, 2021, and his attorney served Defendants via mail on May 3, 2021. ECF No. 5. The U.S. Attorney's Office received service of the lawsuit at its office in St. Paul on May 4, 2021 and it was routed to attorneys for handling the next day. (Kendl Decl. ¶ 2.)

[17] The emergency placement was later expunged. (Ex. 78.)

to a fourteen-day suspension through the grievance process. (Ex. 78.) Smith returned to

work in October 2021 and was awarded backpay for his time off work. (Exs. 81-82.)

### E.    USPS Removes Smith for Being AWOL on the Clock

On March 17, 2022, the plant manager saw Smith sneak out of the building through

an emergency exit and asked a maintenance manager to investigate Smith's time clock

rings. (Exs. 83-84.) Management discovered Smith was still on the clock when he left the

building. He had also taken a "one-click lunch," a discouraged practice of punching out

then punching in a few seconds later to make the computer believe a lunch break had been

taken. (*Id.*) Management unsuccessfully tried to locate Smith after discovering he had left

while on the clock. About a half hour after he left, the maintenance manager saw Smith

return to the building with a brown fast-food bag in his hands. (*Id.*; Knotz: 80:7-17.)

Ingvalsen issued Smith a notice of removal.[18] (Ex. 83.) At the time, Smith had the

following discipline on his record:

- An Oct. 12, 2020, seven-day suspension for failure to follow instructions/unacceptable conduct;

- A Jan. 14, 2021, seven-day suspension for failure to follow instructions/unacceptable conduct;

- A February 3, 2021, 14-day suspension for unacceptable conduct;

- An April 5, 2021, letter of warning for failure to follow instructions;

- A May 27, 2021, 14-day suspension for failure to follow instructions/unacceptable conduct; and

---

[18] Through the grievance process, USPS offered to settle with Smith so the notice of removal would be classified as a resignation. (*See* Ex. 85.) A union steward informed Smith this was the "best choice" and "[y]ou[r] case is unwinnable in arbitration." (*Id.*) Smith did not accept this proposal.

- A November 15, 2021, 14-day suspension or unacceptable conduct.

The same day Ingvalsen issued Smith the notice of removal, Smith alleged Selbitschka again called him a "Black bitch," (Ex. 86). Selbitschka denied he said "Black bitch" but admitted he called Smith a "punk bitch," and was given a 14-day suspension. (*Id.*) USPS removed Selbitschka a few weeks later, also for being absent from work while he was on the clock after taking a one-click lunch. (Ex. 87.)

## ARGUMENT

### I.    Standard of Review

Defendants move for summary judgment on all of Smith's claims. Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

### II.   Smith's Claim for Harassment and Hostile Work Environment under Title VII (Count I) Fails.

Smith alleges he was subject to a hostile work environment and tries to aggregate allegations from his separate postings at Stillwater and the P&DC. But his claim fails. The allegations relating to his time in each facility must be considered separately, and the Stillwater allegations are untimely. Further, even interpreting the record in the light most favorable to Smith, the few race-related incidents he alleges in each location simply do not meet the high threshold set by the Eighth Circuit.

Title VII prohibits "harassment that takes the form of a hostile work environment," *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538 (8th Cir. 2020). "Title VII does

not prohibit all verbal or physical harassment in the workplace and is not a general civility code for the American workplace." *Pedroza v. Cintas Corp. No. 2*, 397 F.3d 1063, 1068 (8th Cir. 2005) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "The standard for demonstrating a hostile work environment under Title VII is 'demanding.' " *Mwassa v. Presbyterian Homes & Servs.*, No. 19-cv-01511 (SRN/HB), 2022 WL 658740, at *13 (D. Minn. March 4, 2022). "A hostile work environment is [one] permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment as viewed objectively by a reasonable person." *Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 618 (8th Cir. 2007).

The "severe and pervasive" standard is a high bar. *Smith*, 2023 WL 2571829, at *5. For example, in one case, the Eighth Circuit held that the following comments made by coworkers to the plaintiff, a Palestinian immigrant, were not sufficient to survive summary judgment: (1) "go back home, to your country," (2) persistent name calling such as "camel jockey, Muslim, Arab, terrorist, and sand ni***r," and (3) "[y]ou should be rounded up in one place and nuke[d]." *Id.* (citing *Abdel-Ghani v. Target Corp.*, 686 F. App'x 377, 378-79 (8th Cir. 2017) (per curiam)). In another, the Eighth Circuit held a plaintiff's claim failed despite evidence that coworkers had told her to "go back to the ghetto," referred to her as a "runaway slave," displayed t-shirts on a computer screen that included the N-word and commented that "black aides don't know what they're doing," among several other racial incidents and comments. *Id.* (citing *Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1081-

17

82 (8th Cir. 2010), *abrogated in part on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) (en banc)).

**A.   Smith's Stillwater Hostile Work Environment Claim Fails.**

To start, any alleged racial harassment Smith suffered at the Stillwater Facility should be considered separately from the P&DC. These allegations involved different supervisors, a totally separate location, and different sorts of alleged misconduct. *See Smith*, 2023 WL 2571829, at *15 (citing *Wilson v. Potter*, Nos. 4:04-cv-00086, 2006 WL 2504312, at *6 (E.D. Ark. Aug. 29, 2006) ("The continuity of a hostile work environment claim may be destroyed . . . if the alleged conduct involves different supervisors and co-workers in different offices.")). In the time between the two series of allegations, Smith switched facilities, switched crafts, and was under different managers. Moreover, there is no evidence in the record that any of the allegedly discriminating employees from Stillwater worked at P&DC or vice versa. Given these differences, any alleged harassment at P&DC was not sufficiently "related" to previous allegations to create one singular, continuing hostile work environment. *See, e.g.*, *Fairley v. Potter*, No. 01-cv-1363, 2003 WL 403361, at *10 (N.D. Cal. Feb. 13, 2003) (no singular, ongoing unlawful employment practice where plaintiff had new co-workers and new manager at a separate USPS facility).

**1.   Smith's Stillwater Claim Is Untimely.**

Because Stillwater is separate, these allegations are independently assessed under the statute of limitations. Under Title VII, any civil action must be commenced within 90 days of receipt of notice of the EEOC's final decision on an appeal. 29 C.F.R.

§ 1614.407. Here, the EEOC decision regarding Smith's Stillwater allegations issued on November 30, 2018. (Ex. 7.) Smith did not file suit until April 30, 2021, more than two years later. There is no dispute that the lawsuit was not filed within the time required by regulation, nor is there any basis to relate the Stillwater and P&DC conduct under a "continuing violation" theory. *See Mandy v. Minn. Min. & Mfg.*, 940 F. Supp. 1463, 1468 (D. Minn. 1996). Therefore, his Stillwater claim should be dismissed on timeliness grounds.

### 2.    Smith's Stillwater Claim Fails on the Merits.

Even on the merits, Smith's allegations related to his time at Stillwater do not constitute a hostile work environment. Smith alleges:

- In March 2015, Hjelmgren told him he would not be promoted to a maintenance position because he was Black and the Post Office is run "by the Good Old Boys." (Ex. 5.)

- In October 2015, Wilson put up a gorilla picture in her workstation to "make people laugh," Michelle later heard Wilson mention that the picture looked like Smith. (Ex. 5; Ex. 9; M. Smith: 208:5-25.)

- On July 13, 2016, Hjelmgren, during a visit to the facility after he had retired, called Smith a "monkey man." (Ex. 5.)

- On August 10, 2016, Hjelmgren, still retired, allegedly told Smith to "go back to the zoo." (*Id.*)

- On November 30, 2016, Klein allegedly accused Smith of not doing his job; (Ex. 11), Smith later testified Klein also told him he was going to "make sure that he got rid of [the Smiths] just like the Obamas." (Smith I: 18:16-25.)

Given the alleged frequency and severity, Smith cannot sustain a hostile work environment claim. *See Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006) ("Allegations of a few isolated or sporadic incidents will not suffice; rather,

the plaintiff must demonstrate the alleged harassment was so intimidating, offensive, or hostile that it poisoned the work environment."). Even if true, these allegations only amount to five incidents over the course of more than three years. *See Smith*, 2023 WL 2571829, at *17 (granting summary judgment when evidence points to "a collection of incidents that span a period of several years"). The allegation that Wilson said the gorilla picture looked like Smith is hearsay and, even if admissible, comments made to someone other than the plaintiff are objectively less severe. *See, e.g.*, *Warmington v. Bd. of Regents of Univ. of Minn.*, 998 F.3d 789, 800 (8th Cir. 2021) ("Many of the incidents were not directed at [Plaintiff].").

And although the Eighth Circuit may allow a claim for a hostile work environment created by a third party, like Hjelmgren in retirement, *see Crist v. Focus Homes, Inc.*, 122 F.3d 1107, 1111-12 (8th Cir. 1997), there is nothing in the record to suggest Smith told USPS about Hjelmgren's alleged "monkey man" comment, which would have permitted them to take action before Hjelmgren allegedly told Smith to "go back to the zoo." *See Nelson v. Anoka Cnty. Cmty. Action Program*, No. 07-cv-4693, 2009 WL 2568573, at *2 n.2 (D. Minn. Aug. 18, 2009) ("An employer may be responsible for the actions of a non-employee . . . where the employer knows or should have known of the alleged harassing conduct and fails to take corrective action.") (citing *Crist*, 122 F.3d at 1108, 1112-13).

Finally, as it relates to Smith's allegations about Klein, Smith must also show USPS knew or should have known about Klein's alleged harassment and failed to take adequate remedial measures. *See Bowen v. Mo. Dep't of Social Serv.*, 311 F.3d 878, 883 (8th Cir.

2002). Smith did not complain about Klein until December 19, 2016, immediately after he transferred to the P&DC, and his allegations at the time contained no hint of racial animus, (Ex. 10); it was not until this litigation started that Smith asserted Klein told him he wanted to get rid of the Smiths "like the Obamas," (Smith I: 18:16-25), and even that comment has only a tenuous connection to race. Summary judgment on this portion of his claim is warranted.

**B.      Smith's P&DC Hostile Work Environment Claim Fails.**

Summary judgment is also warranted on the portion of Smith's hostile work environment claim that stems from his time at the P&DC; he cannot demonstrate that he experienced harassment *because of his race* that was severe and pervasive enough to clear the high bar set by the Eighth Circuit.

Taking Smith's allegations in the light most favorable to him, Smith identified the following incidents involving some arguable connection to his race:

- Ziemer followed Smith around and made animal noises, referred to him and Michelle as "them people" or "those people," on at least three occasions told Smith he had "shit skin" and called him "jigaboo," and told him she hates it when he is "acting black." (Smith I: 58:4-21; 130:22-131:14; 93:6-13; 95:2-17.)

- Someone taped a note to Smith's toolbox on December 17, 2018, that read "Caution: Dead Laker's N****r Storage Ahead." (Ex. 42.)

- While discussing the toolbox note, Ingvalsen told Smith that "a Black person calling another black person an N word ain't racism and that was their culture." (Smith II: 45:6-10.)

- On December 25, 2018, Selbitschka told Smith that an ATM would not work for him because he was Black. (Ex. 48.)

- Twice, during heated verbal altercations, Selbitschka called Smith a "Black bitch." (Exs. 60-61, 86.)

Even crediting Smith's version of events, there is not a triable issue as to whether the conduct Smith experienced was severe and pervasive enough to qualify as a hostile work environment under binding Eight Circuit precedent.

Several factors diminish the objective severity of these allegations. First, Smith's coworkers, rather than his supervisors, made the vast majority of the remarks. "Immediate supervisors' racial harassment is likely to impact[] the work environment far more severely than similar conduct by coequals." *Ellis v. Houston*, 742 F.3d 307, 320 (8th Cir. 2014) (second alteration in original). Other than the remark he alleges Ingvalsen made above— an inarticulate misapprehension of discrimination law as recounted to him by an OIG agent—Smith has produced no evidence of another arguably derogatory racial remark by management.

Further, Smith cannot establish his employer knew or should have known about the co-workers' alleged harassment and failed to implement adequate remedial measures as a matter of course. *See Bowen*, 311 F.3d at 883. Regarding Ziemer, Smith did repeatedly complain about her, and she was frequently disciplined for her conduct, which was almost entirely unrelated to race. *See Smith*, 2023 WL 2571829, at *19 ("[T]he record does not support an inference Ziemer's behavior was primarily motivated by race."). USPS extensively investigated the toolbox note. And regarding Smith's encounters with Selbitschka, USPS disciplined Selbitschka for both incidents in which he allegedly called Smith a "Black bitch." (Exs. 63, 86.)

Second, harassment that comes from someone who harasses coworkers regardless of race is less probative. *See Hawkins v. McDonough*, No. 20-00118-CV-W-BP, 2021 WL 5514004, at *11 (W.D. Mo. Aug. 24, 2021) ("[T]he Record is replete with evidence that other individuals who were members of different categories suffered the same treatment."); *Askari v. L.A. Fitness Int'l, LLC*, 2010 WL 3938320, at *6 (D. Minn. Oct. 5, 2010) (granting summary judgment on harassment claim when plaintiff did not show he had been "singled . . . out" for harassment, but to the contrary, the alleged harasser was "being unfair to everyone"). Smith and other witnesses acknowledge that Ziemer routinely harassed many employees, including white employees. (Allison: 57:10-18; Knotz: 34:22-35:7; Fisher II: 37:15-20; Ziemer: 29:16-15; Ex. 13; Smith I: 41:22-46:25.) As Judge Menendez noted in dismissing Michelle's case, "Ziemer was also awful to other coworkers who were white." *Smith*, 2023 WL 2571829, at *8.

Third, racial comments alone do not render a work environment hostile as a matter of law, particularly in the heat of an altercation between employees. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 893 (8th Cir. 2005). In *Singletary*, the court acknowledged that while "[r]acial epithets are morally repulsive," a plaintiff must "show more than a few occurrences over a course of years." *Id.* Such conduct "must be shown to occur with such frequency that the very conditions of employment are altered and be viewed by a reasonable person as hostile." *Id.* Smith alleges Selbitschka made three racial comments to him during the more than five years they worked together, two of which occurred during heated altercations. This is simply not the sort of frequency that would entitle him to relief.

Finally, the toolbox note does not by itself provide sufficient evidence of a hostile work environment. Although the note was certainly offensive, USPS acted quickly to remove it and investigate; the Eighth Circuit has made clear that such actions lessen the objective severity of this sort of note. *See Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002). Judge Menendez discussed the unique circumstances of the note in her order dismissing Michelle's case:

> Though appalling, this incident does not push the case into a truly hostile work environment. First, we note that it is unclear whether this incident was misguided ribbing, where one party believed it acceptable and the other found it entirely offensive. There is no other claim that this coworker was otherwise racist toward either of the Smiths, but the record does suggest both discord and a persistent rivalry between this person and Mr. Smith. While the Court shares [Ms.] Smith's indignation at the use of this racial slur, taken in the context in which it occurred, it does not tip the record into a place where the Court can find a triable issue on her hostile-work-environment claim.

*Smith*, 2023 WL 2571829, at *8.

This limited collection of incidents *related to Smith's race* simply do not rise to the level of a hostile work environment; it falls short of the incidents described in *Abdel-Ghani* and *Fairview Ridges*, cases in which the Eighth Circuit still affirmed grants of summary judgment. *See* 686 F. App'x at 378-79; 625 F.3d at 1081-82.

To be sure, Smith alleges a host of other incidents related to his long-running disputes with his coworkers. But the vast majority are not tied in any way to Smith's race. *See, e.g.*, *Fairview Ridges*, 625 F.3d at 1083 ("Several of the allegations made by Smith . . . at most only tenuously relate to race. In fact, Smith offers little more than speculation and conjecture that these incidents had anything to do with race."); *Tademe v.*

24

*Saint Cloud State Univ.*, 328 F.3d 982, 991 (8th Cir. 2003) (evidence insufficient when it merely shows that harassment stems from workplace politics and personality conflicts). Instead, the evidence shows long-running, toxic personality disputes between "warring parties." (Ingvalsen I: 40:7-23.) This is simply not sufficient evidence of a hostile work environment *based on Smith's race* to survive summary judgment.

## III.    Smith's Discrimination Claim Fails (Count II).

Smith next alleges that USPS discriminated against him because of his race in violation of Title VII by terminating him, first on May 27, 2021, and then, after reinstating him, again on March 27, 2022. But his claim fails. Smith cannot establish a prima facie case of discrimination because there is no evidence to support an inference that race was the reason for his terminations. And even if there were such evidence, USPS had legitimate reasons to terminate Smith's employment and he can point to no evidence of pretext for racial discrimination.

To survive summary judgment on a Title VII claim, a plaintiff must either provide direct evidence of discrimination or create an inference of unlawful discrimination through the *McDonnell Douglas* framework. *See Bone v. G4S Youth Servs.*, 686 F.3d 948, 954 (8th Cir. 2012). Smith can do neither.

### A.    Smith Has No Direct Evidence of Discrimination.

First, the record is free of direct evidence of discrimination. *See id.* at 953-54 (defining "direct evidence" as "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse

25

employment action) (cleaned up). None of the evidence of racial animus relates to either decision to terminate Smith. Most of it comes from coworkers, and there is no evidence that any of them played a role in the decision to terminate Smith. The comment Smith alleges Ingvalsen made about whether members of the same race can discriminate against each other—which is borderline in terms of whether it shows racial animus at all—came more than three years before Ingvalsen decided to discharge Smith after he was found to be away from work while on the clock and makes no reference to any adverse employment action.

### B.    Smith Cannot Prove Discrimination with Indirect Evidence.

Because Smith has no direct evidence of discrimination, he will need to rely on the *McDonnell-Douglas* framework, whereby a plaintiff must initially present a prima facie case. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc). The employer must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer does this, the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual. *Id.* In Title VII actions, the employee always retains the ultimate burden of proving that he was illegally discriminated against because of race. *See Rose-Maston v. NME Hosp., Inc.*, 133 F.3d 1104, 1107-08 (8th Cir. 1998).

### 1.    Smith cannot establish a prima facie case of discrimination.

To make a prima facie case of race discrimination, Smith must show he was a member of a protected group, that he was performing his job at a level that met his employer's legitimate expectations, that he suffered an adverse employment action, and

that there are facts that permit an inference of discrimination. *See Taylor v. Sw. Bell Tel. Co.*, 251 F.3d 735, 740 (8th Cir. 2001). Here, Smith can present no facts permitting an inference of discrimination.

A plaintiff can establish an inference of discrimination in a variety of ways, such as by showing more-favorable treatment of similarly situated employees who are not in the protected class, by showing biased comments from a decisionmaker, or by showing an employer "failed to follow its own policies" or "shifted its explanation of the employment decision." *Grant v. City of Blytheville, Ark.*, 841 F.3d 767, 774 (8th Cir. 2016) (noting that similarly situated employees must be similarly situated "in all relevant respects"). None of these apply to Smith.

Regarding biased comments from a decision maker, Kurtis Morrissette was the manager who decided to remove Smith from USPS the first time. When asked, Smith could not identify any incidents where Morrissette (who is Black) made any biased racial comments, (Smith II: 61:15-62:10), and in fact he identified Morrissette as the only member of management with whom he felt comfortable discussing race, (Smith I: 164:20-24). Ingvalsen was the manager who decided to remove Smith the second time, and, other than the one comment he made in 2019 about whether the toolbox note could be racist if it was left by a Black person, Smith testified that he never observed any other "acts of racism" from Ingvalsen. (Smith II: 45:6-21.) Nor can Smith show USPS failed to follow its own policies, treated similarly situated employees differently, or shifted its explanation of the reasons for his terminations. Because he cannot establish a prima facie case of discrimination, his discrimination claim fails.

### 2. USPS had legitimate reasons to discipline Smith and terminate his employment.

Even if Smith were able to establish a prima facie case of discrimination, USPS has articulated legitimate, non-discriminatory reasons for his two terminations.[19] Morrissette recommended Smith's first removal for, among other things, threatening his coworkers, insulting one coworker's weight, following Allison around the P&DC, and driving a Powered Industrial Truck without reason to do so or prior approval. (Ex. 73.) The Eighth Circuit has repeatedly held that insubordination and violation of employer policy are legitimate reasons for termination. *Kiel*, 169 F.3d at 1135 (collecting cases). Ingvalsen recommended Smith's second removal because Smith was absent from the workplace while still clocked in. Attendance violations are also legitimate, non-discriminatory reasons for discharge or discipline. *Rose-Maston*, 133 F.3d at 1108.

### 3. Smith cannot show USPS's reasons for terminating him are pretext for discrimination.

Because USPS can articulate legitimate, non-discriminatory reasons for Smith's terminations, he must establish that these reasons are pretextual. *Kiel*, 169 F.3d at 1135. To prove pretext under Title VII, a plaintiff must both discredit the employer's asserted reasons for adverse action and show that circumstances permit drawing the reasonable inference that the real reason for the adverse action was the Plaintiff's race. *See Twymon v.*

---

[19] Because Smith was provided backpay for the time he was off work due to his first removal, it may not constitute an adverse action under prevailing Eighth Circuit authority. *See, e.g.*, *Rester v. Stephens Media, LLC*, 739 F.3d 1127, 1131 (8th Cir. 2014) (adverse employment action "is a tangible change in working conditions that produces a material employment disadvantage.").

*Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006). The ultimate question is whether a plaintiff presents evidence of "conduct or statements by persons involved in [the employer's] decision-making process reflective of a discriminatory attitude sufficient to allow a reasonable jury to infer that that attitude was a motivating factor in [the employer's] decision to fire [the plaintiff]." *Feltmann v. Sieben*, 108 F.3d 970, 975 (8th Cir. 1997).

Smith challenges two terminations here. There is no evidence of pretext related to the first termination, which was issued by Morrissette. That Morrissette was the supervisor who issued the discipline negates an inference of pretext because Morrissette, too, is Black. *See Askari*, 2010 WL 3938320, at *5 ("[A] plaintiff faces a difficult burden of establishing discrimination when the decision-maker is a member of the same protected class as the plaintiff."). There is also no evidence suggesting white USPS employees who engaged in similar conduct were treated better than Smith.

Nor is there evidence of pretext related to the second termination. The second termination was recommended by Ingvalsen because Smith was absent from work while still on the clock. While Ingvalsen is white, he had also been Smith's manager for years. And Ingvalsen as a manager was part the small group that interviewed Smith and agreed he was eligible for promotion in 2018. The fact that Ingvalsen promoted Smith weighs against a finding of pretext. *See Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 976 (8th Cir. 2006) (strong inference that no discrimination occurred exists when same actor hires and fires employee in short time). Likewise, there is no evidence to suggest similarly situated white employees who engaged in similar conduct were treated better than Smith. In fact,

Smith's foe Selbitschka, who is white, was removed for similar conduct as Smith just a few weeks later. (Ex. 87.)

Regarding his second termination, in his deposition Smith presented myriad after-the-fact excuses for why he was allowed to be away from work while on the clock, none of which he recounted during the investigative interview before his termination. (*Compare* Smith II: 11:23-20:10, *with* Ex. 83.) Even if his post hoc rationale is credited, this does not point to pretext. There is no evidence Ingvalsen was aware of Smith's excuses at the time he made the decision to remove Smith, and there is no indication that Ingvalsen did not honestly believe Smith violated USPS policy in making the decision. *See Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 811 (8th Cir. 2005).

Because Smith can present no evidence suggesting that his termination was pretext for racial discrimination, his Title VII discrimination claim fails.

## IV.     Smith's Retaliation Claim Fails (Count III).

Smith next alleges USPS retaliated against him after he filed this lawsuit by "escorting him off the premises and terminating his employment" on May 27, 2021, then, after it reinstated him, by "papering his file . . . and terminat[ing] him again" on March 27, 2022. This claim fails too. Not only are the reasons USPS terminated Smith well documented, USPS's concerns about his behavior at work far predate his first termination. And his second termination occurred almost a year after he filed his lawsuit.

### A.     Smith Cannot Establish a Prima Facie Case of Retaliation.

Because Smith has no direct evidence of retaliation, he will need to rely on the *McDonnell-Douglas* framework. To present a prima facie case of retaliation, a plaintiff

must show that he engaged in protected conduct, that he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct. *See Kiel*, 169 F.3d at 1136. Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace. *Id.* No evidence establishes a causal link between Smith's protected conduct and an adverse employment action.

Here, Smith alleges that he "caused this lawsuit to be served on the Postal Service on May 3, 2021,"[20] and that he was escorted off the premises and placed on investigatory leave "the next day" while the Postal Service first terminated his employment on May 27, 2021. (Am. Compl. ¶¶ 73-74.) A temporal connection alone generally does not present a genuine fact issue on retaliation. *See Kiel*, 169 F.3d at 1136. But even if the allegedly close temporal proximity here were sufficient, Smith's claims fall apart upon further inspection.

First, Smith's counsel's office served this lawsuit on Defendants by placing the summons and complaint in the mail on May 3, 2021, ECF No. 5, and the U.S. Attorney's Office received service of the lawsuit at its office in St. Paul on May 4, 2021. (Kendl Decl. ¶ 2.) Although Smith was escorted off the premises at work on May 5, 2021, due to threatening and insulting coworkers, there is no evidence in the record suggesting that the decisionmakers in Smith's termination, namely, Morrissette or other management, knew about the lawsuit at the time. (*See* Exs. 76-77.) Smith says only that he received

---

[20] Facts regarding the timing of service are presented in Note 16, *supra*.

confirmation that USPS[21] received the lawsuit in the mail but provides no evidence about when USPS received the suit, or that Morrissette knew about the lawsuit at the time of the emergency placement. (Smith II: 67:5-68:2.)

And the record is clear that the employee complaints on which the emergency placement and eventual removal were based started coming into management a week before Smith filed his lawsuit against USPS; the first threat was reported by a mail processing clerk on April 24, 2021. (Ex. 67.) Evidence that an employer was concerned about a particular aspect of an employee's performance *before* the employee engages in protected conduct undercuts any finding of causation. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 504 (8th Cir. 2005). Furthermore, that USPS eventually agreed to bring Smith back to work via the grievance settlement process a few months later further undercuts any inference that USPS was trying to terminate Smith's employment because he had filed a lawsuit against it.

The retaliation allegations relating to Smith's second removal, issued on March 27, 2022, are even more speculative. There is simply nothing in the record that would permit an inference that this termination, which occurred almost 11 months after Smith filed his lawsuit, is related to the fact that Smith sued USPS.

### B.   Smith Presents No Evidence His Removals are Pretext for Retaliation.

Even if Smith could establish an inference that his removals were causally connected to the filing of his lawsuit against USPS, USPS has established that it had

---

[21] Smith testified that he served Morrissette and "Mary Op" via mail, but the docket does not reflect any such service. *See* ECF No. 5.

legitimate, non-retaliatory reasons to terminate his employment: his threats to his colleagues, and the fact he was absent from work while on the clock. *See supra* Parts III.B.2. and III.B.3. The burden then shifts to Smith to establish that USPS's reasons for Smith's termination are pretextual, and the real reason for his removals were because of his lawsuit. *See Sims v. Health Midwest Physician Servs. Corp.*, 196 F.3d 915, 921 (8th Cir. 1999) (employee's retaliation claim failed because she failed to offer substantial evidence to show proffered reason was pretextual). As discussed above, not only is there no evidence of a causal connection between his lawsuit and his removals, he cannot show that any employees who were similarly situated to him, but did not engage in protected conduct, were treated differently. Because he cannot do so, his retaliation claim fails.

## CONCLUSION

For the reasons articulated above, Defendants respectfully request that the Court grant summary judgment and dismiss Plaintiff's claims with prejudice.

Dated: July 21, 2023

ANDREW M. LUGER
United States Attorney

*s/ Andrew Tweeten*

By: ANDREW TWEETEN
Assistant U.S. Attorney
Attorney ID Number 0395190
EMILY M. PETERSON
Assistant U.S. Attorney
Attorney ID Number 0395218
600 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
(612) 664-5600
andrew.tweeten@usdoj.gov
emily.peterson@usdoj.gov

Attorneys for Defendants