UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

STEVEN LINELL SMITH,                                   Case No. 21-CV-1134 (PJS/ECW)

              Plaintiff,

v.                                                                                    ORDER

UNITED STATES POSTAL SERVICE and
LOUIS DEJOY, U.S. Postmaster General, in
his official capacity,

              Defendants.

---

Charles Shafer, COLLINS, BUCKLEY, SAUNTRY & HAUGH PLLP, for plaintiff.

Andrew Tweeten, UNITED STATES ATTORNEY'S OFFICE, for defendants.

Plaintiff Steven Smith brings hostile-environment, discrimination, and retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., against defendants United States Postal Service and Louis DeJoy (together, "USPS"). This matter is before the Court on the motion of USPS for summary judgment.[1] For the reasons explained below, the Court grants the motion in part and denies the motion in part. Specifically, the Court denies the motion as to Smith's hostile-environment claim and grants the motion in all other respects.

---

[1] Smith's second amended complaint contains four counts. The parties have stipulated to the dismissal of Count IV. ECF Nos. 55, 57. USPS moves for summary judgment on the remaining counts.

I.  BACKGROUND

Many facts are in dispute.  In ruling on a motion for summary judgment, however, the Court must assume that the non-movant's version of events is true, and the Court must draw "all justifiable inferences . . . in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Smith alleges the following:

Smith, who is black, began working for USPS as a custodian in 2013.  His wife, Michelle Smith ("Michelle"), who is also black, has worked as a custodian for USPS since 2006.

From October 2013 to December 2016, the Smiths worked at a USPS facility in Stillwater, Minnesota.  While at the Stillwater facility, Smith experienced racially derogatory comments from coworkers and superiors.  In December 2016, after someone called the police on Smith while he was picking up trash in the parking lot of the Stillwater facility, Smith transferred to USPS's St. Paul Processing and Distribution Center ("P&DC") in Eagan, Minnesota.  *See* S. Smith Dep. I 26:1–23, ECF No. 69-2. Michelle transferred to the P&DC the following month.  *See* M. Smith Dep. 40:11–12, ECF No. 69-1.

Almost immediately after arriving at the P&DC, the Smiths began having conflicts with another custodian, a white woman named Ann Ziemer.  Ziemer had a well-earned reputation for harassing and bullying other employees.  *See* Shafer Decl.

Ex. 25, ECF No. 69-25.  The Court will not recount every episode in the long running

conflict between Ziemer and the Smiths.  Suffice it to say that Ziemer's conduct toward

the Smiths ranged from bizarre and annoying (*e.g.*, Ziemer following Smith around

while making animal and circus noises, *see* S. Smith Dep. I 58:1–21) to downright

frightening (*e.g.*, Ziemer following the Smiths home and sitting in her car outside of

their house, *see id.* at 71:11–79:23).  The antagonism between Ziemer and the Smiths

seems to have been mutual.  *See, e.g.*, Love-Hobbs Decl. Exs. 14, 15, ECF Nos. 61-14, 61-

15 (dueling narratives from Smith and Ziemer of specific shouting match).  There is no

dispute, however, that Ziemer was fixated on the Smiths, and a report from an

investigation of the Smiths' early complaints about Ziemer reflects several coworkers'

opinions that Ziemer had "targeted" and was "stalking" the Smiths.  *See* Shafer Decl.

Ex. 25 4–5.[2]

Strife between Ziemer and the Smiths continued throughout 2017.  Management

at the P&DC first responded by directing Ziemer and the Smiths to stay away from each

other, but that did not work.  In fact, Ziemer was disciplined at one point for failing to

comply with that order—although it does not appear that she was disciplined for any of

the harassing conduct that made the order necessary.  *See* Love-Hobbs Decl. Ex. 18, ECF

---

[2]Because many of the parties' exhibits are comprised of multiple documents with inconsistent Bates numbering, the Court will cite to the page numbers generated by the Court's CM/ECF filing system except in the case of deposition transcripts.

No. 61-18.  Eventually, as Ziemer and the Smiths continued to cross paths and continued to be in conflict, management attempted to remedy the problem by transferring Ziemer and Smith to separate facilities.  But both Ziemer and Smith filed grievances challenging their transfers, and by the fall of 2017, both had returned to the P&DC.  *See, e.g.*, S. Smith Dep. I 95:2–4; Franseen Dep. 96:22–97:4, ECF No. 69-15.

After Smith and Ziemer returned to the P&DC, Ziemer began directing explicitly racist epithets at the Smiths.  Among other things, Ziemer told Smith that she couldn't stand him "acting black," called him "jigaboo" at least three times between 2017 and 2022, and called him "shit skin" at least two times during the same period.  *See* S. Smith Dep. I 153:9–154:12.  One of Smith's supervisors, Kurtis Morrissette, recalled receiving complaints from Smith about such comments from Ziemer.  *See* Morrissette Dep. II 31:17–21, 121:25–125:7, ECF No. 69-10.  In a Rule 30(b)(6) deposition, USPS acknowledged being aware of Smith's allegation that Ziemer called him "shit skin."  *See* Ingvalsen 30(b)(6) Dep. 13:10–17, ECF No. 69-11.

Ziemer also continued harassing the Smiths in ways that were not explicitly racist.  For example, she received a seven-day suspension at the beginning of 2018 for following the Smiths around the P&DC while taking pictures of them and reporting on their whereabouts to management.  *See* Shafer Decl. Ex. 28 4–6, ECF No. 69-28.  She also made reports of misconduct against the Smiths—reports that proved to be untrue or

lacking in credibility.  *See, e.g., id.* at 140:1–17; S. Smith Decl. ¶ 7, ECF No. 67.  And in July 2018, she blocked the Smiths' vehicle in the P&DC parking lot, wrote down their license number, and called the police to (falsely) report that Smith had threatened her. *See, e.g.*, S. Smith Dep. I 114:14–116:8; S. Smith Decl. Ex. 6 19–21.

In the summer of 2018, USPS promoted Smith to the position of maintenance mechanic.  Around the same time, Smith started to have conflict with Justin Allison, another maintenance mechanic who identifies as biracial, and whom Smith initially identified as black.  *See* S. Smith Dep. I 108:18–109:1.  Interactions between Allison and Smith quickly turned overtly and consistently hostile.  For example, in November 2018, Allison received a seven-day suspension for an altercation with Smith that ended with Allison (falsely) reporting to the police that Smith had threatened Allison's son.  *See* Shafer Decl. Ex. 47 32–34, ECF No. 78.  And in December 2018, both Allison and Ziemer received letters of warning for "creating a hostile work environment" by yelling at Smith.  *See* Shafer Decl. Ex. 45, ECF No. 69-37.  Smith was also reprimanded for his role in the confrontation with Allison and Ziemer, *see* Love-Hobbs Decl. Ex. 40, ECF No. 61-40, and Allison continually made complaints to management about threatening and harassing behavior from Smith.  *See, e.g.*, Love-Hobbs Decl. Exs. 33, 34, ECF Nos. 61-33, 61-34.

On December 17, 2018—only a few days after Allison and Ziemer received letters of warning for shouting at Smith—Smith arrived at work to find a note taped to his toolbox. The note read, "Caution: Dead Laker's Nigger Storage Ahead" [sic], an apparent reference to Smith's habit of wearing a Los Angeles Lakers hat to work. *See* Love-Hobbs Decl. Ex. 42, ECF No. 61-42. Smith viewed the note as a racially motivated threat on his life. *See* S. Smith Dep. II 212:15–23, ECF No. 69-13. Smith reported the note to management, and management initiated an investigation. Management contacted the Postal Inspection Service and the Office of the Inspector General ("OIG"), and eventually interviewed every maintenance worker who was at the facility on the day the note was discovered. *See* Ingvalsen 30(b)(6) Dep. 15:11–17:17. The Smiths indicated that they believed Allison had left the note, *see id.* at 17:23–18:1, and during the employee interviews, other employees also seemed to point the finger at Allison (although no employee claimed to have witnessed the incident). *See* Love-Hobbs Decl. Ex. 44 3, 5–7, 54, ECF No. 61-44.

Investigative records from the incident suggest that management treated the toolbox note as just the latest episode in the ongoing conflict between Smith and Allison. For example, an OIG report on the toolbox note (released more than a year after the incident) focused largely on *Allison's* complaints about being harassed by *Smith. See* Love-Hobbs Decl. Ex. 43, ECF No. 61-43. Similarly, an "EEO Affidavit"

about the incident completed by Mitch Ingvalsen, the maintenance-tour supervisor who directed management's investigation of the note, referred to Smith and Allison as the parties involved in the incident and focused on how the two had regularly provoked each other.  *See* Love-Hobbs Decl. Ex. 45 ¶¶ 10, 19, 28, 37, ECF No. 61-45.

Ingvalsen also explained in both the EEO Affidavit and in a deposition that he was told by an OIG agent early in the investigation that, if Allison left the toolbox note, then the note could not have reflected racial animus, because Allison and Smith were of the same race.  *See, e.g.*, *id.* ¶ 17; Ingvalsen Dep. 26:23–27:19, 108:8–19, 115:9–13, ECF No. 69-12.[3]  According to Smith, Ingvalsen echoed that understanding during a meeting about the toolbox note, *see* S. Smith Dep. II 45:6–18, and by one account, that OIG agent's erroneous legal advice ended management's investigation.  *See* Franseen Dep. 82:23–84:8.  In any case, it is undisputed that the investigation essentially ended after nobody took responsibility for the note or admitted to witnessing anything.  No corrective action was taken, save for USPS management meeting with Allison and the Smiths and urging them to get along.  *See* Ingvalsen Dep. 112:17–113:22, 120:25–10, 124:14–125:20.

---

[3]The OIG agent was obviously wrong.  *See Ross v. Douglas County*, 234 F.3d 391, 396 (8th Cir. 2000) (explaining that, "as a matter of law, a black male could discriminate against another black male 'because of such individual's race'").

Smith and Allison did not take management's advice.  On December 25, 2018, only a few days after the toolbox note was discovered, Smith reported to management that Allison was present when a white maintenance worker, John Selbitschka, remarked to Smith that an ATM would not work for him because he was black.  *See* S. Smith Decl. Ex. 11 39–42.  In May 2019, Smith also reported to management that Allison harassed him about the toolbox note, saying he knew who had left it and that management would do nothing about it.  *See* S. Smith Decl. Ex. 14 50–51.  Meanwhile, Allison continued to complain about Smith, including complaining in June 2019 that Smith had used racial slurs against him.  *See* Love-Hobbs Decl. Ex. 50, ECF No. 61-50.  The conflict between Smith and Allison continued for as long as the two remained employed at the P&DC.

The ATM comment was not the only racist remark that Smith experienced from Selbitschka.  In October 2020, Selbitschka blew up at Smith after Smith asked him to pull up his mask, and Selbitschka called Smith a "black bitch" while attempting to start a physical fight with him.  *See* S. Smith Dep. II 96:15–97:15; Weldon Dep. 7:9–13:19, ECF No. 69-20.  Two witnesses reported the incident to management, *see* Love-Hobbs Decl. Exs. 60, 61, ECF Nos. 61-60, 61-61, but the record does not seem to contain any evidence about management's response to the reports.  USPS did, however, issue seven-day suspensions to both Smith and Selbitschka for an altercation that occurred a few days

later during which they almost came to blows. *See* Love-Hobbs Decl. Exs. 63, 64, ECF Nos. 61-63, 61-64. And in March 2022, Smith again reported that Selbitschka had called him "black bitch." *See* S. Smith Decl. Ex. 24 80–82. USPS issued Selbitschka a seven-day suspension for that incident after he admitted to calling Smith a "punk bitch." *See* Love-Hobbs Decl. Ex. 86, ECF No. 61-86.

Smith filed this lawsuit in April 2021, and the United States Attorney's Office ("USAO") received notice of this lawsuit on May 4, 2021. *See* Kendl Decl. ¶ 2, ECF No. 63. On that same day (May 4), Morrissette decided (after consulting other USPS managers) to place Smith on emergency leave while USPS investigated allegations that Smith had threatened another coworker. *See, e.g.*, Morrissette Dep. II 121:25–125:7; Love-Hobbs Decl. Exs. 76, 77, ECF Nos. 61-76, 61-77. A few weeks later, Morrissette issued a notice-of-removal letter to Smith, citing as the basis for his removal the alleged threats that had prompted the emergency leave, as well as several insulting comments that Smith had recently made toward Allison's girlfriend and Smith's unauthorized use of a powered industrial truck. *See* Love-Hobbs Decl. Ex. 73, ECF No. 61-73.

One member of management (the head of labor relations at the P&DC) knew of Smith's lawsuit at the time of his emergency leave and subsequent removal, and Morrissette believes he would have spoken with that manager before terminating Smith. *See* Morrissette Dep. II 143:1–144:3. But there is no evidence that Morrissette

knew that Smith had filed this lawsuit at the time that he removed Smith.  Morrissette also testified in an administrative hearing that he did not know if he found the threat allegations against Smith credible, *see* Morrissette Dep. I 39:5–15, ECF No. 69-9, but in a subsequent deposition, he testified that he ultimately concluded that those allegations were credible.  *See* Morrissette Dep. II 112:16–113:9   Eventually, Smith's removal was reduced to a 14-day suspension through the grievance process, and Smith returned to work with back pay in October 2021.  *See* Love-Hobbs Decl. Ex. 78, ECF No. 61-78.

In March 2022, USPS once again terminated Smith's employment, this time for being absent without leave ("AWOL") and for taking a "one-click lunch," a prohibited (but apparently somewhat common) time-clock practice that tricks USPS's time-tracking program into awarding unwarranted overtime pay.  *See* Love-Hobbs Decl. Ex. 83, ECF No. 61-83.  Because USPS's progressive discipline system takes recent prior discipline into account, Smith's initial 2021 removal (which, as noted, had been reduced to a suspension) also formed part of the basis for his removal in March 2022.  *See id*. at 3. Less than a month later, USPS also removed Selbitschka for taking one-click lunches, *see* Love-Hobbs Decl. Ex. 86, ECF No. 61-86, but Selbitschka evidently returned to work, because in November 2022 USPS removed him again for stealing a check from the mail. *See* Shafer Decl. Ex. 43, ECF No. 77.  Allison was also removed for being AWOL,

-10-

although his removal was reduced to a 14-day suspension via the grievance process.
*See* Shafer Decl. Ex. 47 2–5.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Hostile Environment

Smith first alleges that USPS discriminated against him by maintaining a hostile environment at the P&DC.[4] A hostile-environment claim under Title VII requires a plaintiff to prove that "(1) he is a member of a protected group; (2) he was subject to unwelcome race-based harassment; (3) the harassment was because of membership in

---

[4]Smith conceded at oral argument that any claims related to his employment at the Stillwater facility are time barred.

the protected group; and (4) the harassment affected a term, condition, or privilege of employment." *Malone v. Ameren UE*, 646 F.3d 512, 517 (8th Cir. 2011). "Moreover, if an employee's hostile work environment claim is based on harassment by non-supervisory co-workers, the employee must also prove that the employer 'knew or should have known of the harassment and failed to take proper remedial action.'" *Clay v. Credit Bureau Enterps., Inc.*, 754 F.3d 535, 540 (8th Cir. 2014) (quoting *Malone*, 646 F.3d at 517).

To affect a term, condition, or privilege of employment, race-based harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment."[5] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "To decide whether a work environment is objectively offensive, that is, one which a reasonable person would find hostile or abusive, [courts] examine all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance." *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892–93 (8th Cir. 2005).

USPS does not deny that Smith experienced some unwelcome race-based harassment, but argues that most of the conduct about which Smith complains had

---

[5]The plaintiff must also "subjectively perceive the environment to be abusive," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), but USPS does not argue that Smith has failed to produce sufficient evidence on this point.

nothing to do with his race and thus did not violate Title VII (which prohibits only harassment "because of" race.  42 U.S.C. §§ 2000e-2(a)(1)).  The crux of the issue is whether harassing conduct that is not, on its face, connected to race can nevertheless be "counted" in assessing whether a plaintiff has been subject to race-based harassment that was sufficiently severe to affect a term, condition, or privilege of employment.

The parties point to seemingly competing lines of Eighth Circuit precedent.  *Compare Smith v. Fairview Ridges Hosp.*, 625 F.3d 1076, 1083–85 (8th Cir. 2010) (declining to treat facially race-neutral conduct as part of a pattern of racial harassment), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011), *and Singletary*, 423 F.3d at 893 (finding that "[a]cts of apparently indiscriminate vandalism do not have sufficient racial character to establish a hostile work environment without proof that race motivated the conduct"), *with Bowen v. Mo. Dep't of Soc. Servs.*, 311 F.3d 878, 884 (8th Cir. 2002) (finding that because harasser's initial "epithets carried clear racial overtones, they permit an inference that racial animus motivated not only her overtly discriminatory conduct but all of her offensive conduct towards" the plaintiff), *and Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 800 (8th Cir. 2003) (finding coworker's early comments demeaning Hispanics "sufficient for a fact-finder to find that her ongoing harassment of Ms. Diaz was based on her national origin").

-13-

A close reading of these cases demonstrates, however, that facially race-neutral conduct can support a race-based hostile-environment claim when the race-neutral conduct is sufficiently connected to overtly racist conduct.  In *Fairview Ridges*, for example, the Eighth Circuit emphasized that the race-neutral conduct lacked any "connection to or nexus with an obvious or overt racial incident," noting that there was no "congruency of person or incident" between the race-neutral conduct and the overtly racist conduct.  625 F.3d at 1084–85.  The *Fairview Ridges* court reconciled its decision with *Bowen* by noting that the employee who had engaged in race-neutral harassment in *Bowen* had earlier engaged in explicitly racist conduct by telling the plaintiff to "kiss my ass, you white bitch."  *Id.* at 1084 (quoting *Bowen*, 311 F.3d at 881–82).  *Fairview Ridges* similarly observed that, in *Diaz*, the facially neutral conduct was part of a pattern of discriminatory harassment because it had been engaged in by coworkers who had earlier engaged in explicitly racist conduct by demeaning and ridiculing the plaintiff's ethnicity.  *Id.* at 1084–85.

Following the lead of *Fairview Ridges*, this Court will focus on "congruency of person or incident," *id.* at 1085, in determining whether facially race-neutral incidents of harassment suffered by Smith are sufficiently connected to overtly racist incidents of harassment to be deemed to be part of the same pattern of racial harassment.  The Court notes that neither *Diaz* nor *Bowen* "counted" any race-neutral conduct that occurred

*before* the first overtly racist instance of harassment. *See, e.g.*, *Diaz*, 318 F.3d at 800 (noting harasser's "early" explicitly derogatory comments); *Bowen*, 311 F.3d at 885 (describing pattern of racial harassment as "commencing" with "white bitch" comment). Again, the Court will follow the Eighth Circuit's lead.

A jury could conclude that Ziemer first directed explicitly racist slurs at Smith as early as September 2017, when the two returned to the P&DC after successfully grieving their transfers. With respect to Allison, there is sufficient evidence for a jury to infer that Allison was responsible for the December 2018 toolbox incident, which was obviously overtly racist. And Selbitschka made an explicitly racist comment about the ATM in December 2018.

Counting only overtly racist conduct and facially race-neutral conduct that a person engaged in *after* engaging in overtly racist conduct, the Court has identified at least 32 incidents of harassment directed at Smith between September 2017 and March 2022 that could "count" toward his hostile-environment claim. *See* Shafer Decl. Exhibit Index Nos. 8–12, 14–15, 17–24, 27–29, 31–41, 43–44, 47.[6] A number of these incidents involved physical threats, and one—the toolbox note—involved a death threat. *See, e.g.*, *Singletary*, 423 F.3d at 893 (directing courts to consider the harassment's "severity,"

_____

[6]Given the sprawling nature of the record, it is likely that evidence exists of additional qualifying incidents, but the Court has identified a sufficient number of incidents to allow a jury to find in Smith's favor.

including "whether it is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance"); *Reedy v. Quebecor Printing Eagle, Inc.*, 333 F.3d 906, 999 (8th Cir. 2003) (finding that racial graffiti which could "be described as nothing less than a death threat aimed directly and specifically at" plaintiff could "fairly be characterized as severe"). Given this combination of frequency and severity, a jury could find for Smith on his hostile-environment claim.

USPS's remaining arguments are unavailing.  USPS attempts to minimize the conduct of Ziemer and Allison by pointing to evidence that Ziemer was terrible to other employees and by emphasizing that Allison is also black.  But both arguments are foreclosed by *Ross*, in which the Eighth Circuit held that, "as a matter of law, a black male could discriminate against another black male 'because of such individual's race,'" and that the harasser's use of racial epithets against the plaintiff was sufficient to show that the harassment was race-based despite evidence that the harasser also mistreated people of other races.  234 F.3d at 396.[7]

---

[7]For this reason, the Court respectfully disagrees with portions of the order granting summary judgment in Michelle's case.  *See Smith v. DeJoy*, No. 0:20-cv-00498 (KMM/DTS), 2023 WL 2571829, at *8 (D. Minn. Mar. 20, 2023) (emphasizing that "the record shows that Ziemer was also awful to other coworkers who were white" in granting summary judgment on hostile-environment claim).

Finally, although USPS insists that it adequately responded to Smith's complaints, there is sufficient evidence for a jury to find otherwise. Indeed, the mere fact that the harassment persisted as long as it did is evidence that USPS's response was inadequate. USPS may have periodically disciplined Ziemer, Allison, and Selbitschka, but few (if any) of the records of those employees appear to acknowledge that they had engaged in *racial* harassment, despite the fact that Smith had again and again informed his supervisors that he had been victimized by explicitly racist comments. Moreover, while USPS promptly investigated the toolbox note, the investigation appears to have ended prematurely based on an OIG agent's misunderstanding of employment-discrimination law. USPS also suggests that it could not have taken further action to deter Smith's harassment without running afoul of the collective bargaining agreement. That is difficult to believe, however, as USPS cannot contract its way out of its statutory obligation to remedy a racially hostile workplace. In short, a jury could find that USPS did not adequately respond to reports of race-based harassment of Smith. *See Reedy*, 333 F.3d at 910 ("When a plaintiff shows that an employer has a mixed record with regard to handling harassing incidents, we have generally determined that there is a genuine issue of material fact, to be decided by a jury, as to whether the employer's remedial actions have been prompt and effective.").

For these reasons, USPS's motion for summary judgment on Smith's hostile-environment claim is denied.

## C. Discrimination

Smith next alleges that USPS discriminated against him on the basis of race when it terminated him in May 2021 and again in March 2022.  Because he does not have direct evidence that those responsible for his terminations were motivated by racial animus, Smith relies on the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, Smith must establish a prima facie case by showing that "(1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination (for example, similarly situated employees outside the protected class were treated differently)."  *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853–54 (8th Cir. 2012)).  If Smith establishes a prima facie case, USPS must identify a legitimate, non-discriminatory reason for Smith's terminations, at which point the burden shifts back to Smith to offer evidence that "the proffered justification is merely a pretext for discrimination."  *Id.*

The Court agrees with USPS that Smith has failed to offer evidence giving rise to an inference of discrimination.  For the most part, the evidence to which Smith points

has nothing to do with either Morrissette or Ingvalsen, the supervisors who made the termination decisions.  The only facts Smith points to with respect to either supervisor are that Morrissette testified inconsistently about one aspect of Smith's first termination, and that at some point in the aftermath of the toolbox-note investigation, Ingvalsen shared with Smith the erroneous legal advice that he had received from the OIG agent.

Neither of these facts raises an inference of discrimination.  Although Morrissette testified somewhat inconsistently about how credible he found the allegations that Smith had threatened a coworker, that (rather mild) inconsistency has no impact on the other two (non-discriminatory) bases for Smith's first termination.  As to Ingvalsen, he may at one point have relayed erroneous legal advice that he had received from the OIG agent, but that has nothing to do with his decision to terminate Smith more than three years later.

Smith also seeks to raise an inference of discrimination by asserting that similarly situated employees were treated more favorably.  Specifically, Smith argues that his purported comparators threatened coworkers, took one-click lunches, or went AWOL, and yet were not terminated.  But Smith has failed to produce evidence that three of his purported comparators (Kim Elledge, Lathais Kue, and Yang Lee) were "similarly situated in all relevant respects."  *Builders Steel*, 754 F.3d at 578 (quoting *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir.2012)).  That leaves only Allison and Selbitschka as

potential comparators.  But the evidence is clear that USPS regarded Smith and Allison as being of the same race, and that both Allison and Selbitschka received notices of removal for the same conduct as Smith (Selbitschka for taking one-click lunches, and Allison for being AWOL).

Even if Smith had established a prima facie case of discrimination, the Court would dismiss his claim because he has insufficient evidence of pretext.  Smith contends that an inference of discrimination arises because USPS "papered his file."  *See Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 761 (8th Cir. 2004).  But Smith does not contest that his disciplinary records "reflect legitimate, employment-related concerns and do not reflect false accusations" on USPS's part.  *Fairview Ridges*, 625 F.3d at 1088.  Nor does Smith point to any evidence that USPS treated his file differently from the files of other employees.  USPS's documentation of genuine infractions therefore does not suggest an attempt to "paper" Smith's file.

Similarly, Smith's assertion that USPS inconsistently applied a policy of not acting on "he-said-she-said" accusations cannot establish pretext, given that USPS often declined to discipline *Smith* in response to "he-said-she-said" accusations about him.  Finally, the Court rejects Smith's last-ditch claim that a juror could infer that USPS *generally* displayed racial animus toward black employees *generally*.  Not only does Smith's evidence not come remotely close to proving that this is true, but accepting

-20-

Smith's argument would mean that USPS could never receive summary judgment in a discrimination case involving a black employee.

For these reasons, the Court grants USPS's motion for summary judgment on Smith's claim of discriminatory termination.

### D. Retaliation

Finally, Smith alleges that USPS fired him in retaliation for filing this lawsuit. Smith's claim fails, because he does not have sufficient evidence of a causal link between his terminations and the filing of this lawsuit. *See Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1064 (8th Cir. 2020) (prima facie case of retaliation requires, among other things, evidence of a causal link between the protected conduct and the adverse action). Instead, Smith "offers no more than a temporal connection to suggest causation here, and even that connection is, at best, tenuous." *Id.* at 1065. Smith points out that he was put on emergency leave the very day that the USAO received notice of this lawsuit, but he has no evidence to suggest that, in the space of less than a day, news of the lawsuit made its way from the USAO to its contact at USPS, and then from that person to Morrissette. Moreover, a "plaintiff's prima facie retaliation case, built on temporal proximity, is undermined where the allegedly retaliatory motive coincides temporally with the non-retaliatory motive." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir. 2011).

Finally, even assuming that Smith could establish a prima facie case of retaliation, his claim would still fail, as USPS has identified a legitimate reason for his second termination, and Smith relies on the same evidence of pretext that the Court has already found insufficient. The Court therefore grants summary judgment to USPS on Smith's retaliation claim.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT defendants' motion for summary judgment [ECF No. 58] is GRANTED IN PART and DENIED IN PART as follows:

1.   The motion is GRANTED as to Count I insofar as it asserts claims predicated on events that occurred at the Stillwater facility. Those claims are DISMISSED WITH PREJUDICE AND ON THE MERITS.

2.   The motion is GRANTED as to Counts II and III. Counts II and III are DISMISSED WITH PREJUDICE AND ON THE MERITS.

3.   The motion is DENIED in all other respects.

Dated:  March 20, 2024

_____
Patrick J. Schiltz, Chief Judge
United States District Court